1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| LAURA GRAGG and JOHN GRAGG,<br><br>Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF SOCIAL & HEALTH SERVICES, an agency of the State of Washington and NICOLE REED and JOHN DOE REED, and their marital community,<br><br>Defendants. | CASE NO. C13-cv-5620 RBL<br><br>ORDER |

This matter is before the court on competing motions for summary judgment: Defendants' Motion for Summary Judgment (Dkt. 31) and Plaintiffs' Motion for Partial Summary Judgment (Dkt. 27). The Court has reviewed all materials filed for and against said motions. Oral argument occurred on May 5, 2015.

For the following reasons, the Defendants' Motion for Summary Judgment (Dkt. 31) is GRANTED and the Plaintiffs' Motion for Partial Summary Judgment (Dkt. 27) is DENIED.

ORDER - 1

# FACTS

The undisputed facts as represented to the Court are as follows:

Defendant Reed is currently employed by the Department of Social and Health Services (DSHS) as a Social and Program Health Consultant in the Division of Children and Family Services. Reed has been employed by DSHS since March 2008. In April of 2010, Reed was a Court Services Social Worker, which is a position responsible for preparing dependency petitions, filing court papers, serving parties, and attending court hearings.

Laura and John Gragg are the parents of C.G. C.G. was born prematurely on September 6, 2009. Due to C.G.'s premature birth, he developed various health problems, including chronic lung disease. He underwent a tracheotomy in which an opening was made in his windpipe and a cuffed tube was placed within. C.G. also had a gastrostomy tube (G tube) inserted into his stomach to deliver food directly into the stomach.

C.G. was discharged from the hospital on March 23, 2010. Upon discharge, Mary Bridge staff instructed the parents to suction C.G.'s trach tube to a depth of 11 cm. The correct depth to suction a trach tube with a cuff was 14.5 cm. At 11 cm the suctioning was not deep enough to clear the entire passage.

With these wrong instructions, C.G. immediately began to have problems. The day after discharge, he vomited large amounts of his food. C.G. was on a Neocate formula diet at the time. At discharge, the doctors' recommendations were Neocate or dairy and soy free breast milk. Laura had been dairy and soy free, so they began to experiment with breast milk to see if it would help the vomiting issue. The doctor at Mary Bridge recommended that Laura continue with the Neocate feedings and not switch to breast milk.

1   On March 30, 2010, C.G. aspirated and was transported to Mary Bridge emergency room. He could not breathe. He became bradycardia, turned blue, and he suffered cardiac arrest requiring CPR. C.G. was readmitted to the Mary Bridge Pediatric Intensive Care Unit.

The Pediatric Intensivist, on April 2, 2010 in a hospital note, blamed the parents for ignoring medical advice causing a life threatening event. The doctor advised surgery to insert a GJ tube to avoid further aspiration and another cardiac event. The parents refused. The Pediatric Intensivist notified CPS and requested a court order for the procedure. Mr. Gragg stated his intention to transfer C.G. to Children's Hospital for a second opinion. The doctor advised the parents of their right to transfer C.G. and that they would need to identify a doctor willing to transfer the patient and that their insurance company would likely need to pay for the ambulance transfer.

The social worker at Mary Bridge contacted CPS (Angie O'Neil) regarding the parents' intent to transfer to Children's in Seattle for a second opinion and that a medical team would request that CPS place the patient on hold if the parents intended to discharge C.G. to the home.

On April 6, 2010, Reed prepared a dependency petition to file with the Juvenile Court. The dependency petition included the allegations that were received in the CPS referral from the hospital. In addition, prior to the filing of the petition, Reed had learned that Mary Bridge had placed C.G. on a medical hold and that the hospital had determined the parents were feeding C.G. breast milk instead of formula as recommended by the hospital. Reed did not make mention of the second opinion request in the petition.

On April 6, 2010, a shelter care hearing was held and Reed attended. At that hearing the Assistant Attorney General assigned to represent the Department in this case, Barbara Bailey, advised the Court that DSHS was aware there had been discussions regarding the fact that the

ORDER - 3

parents were seeking a second opinion. There was also discussion regarding how to get C.G. to the appropriate second opinion because at the time of the hearing, C.G. was still hospitalized at Mary Bridge. At the time of this hearing C.G. was still on a medical hold by Mary Bridge. An Order to Take Child Into Custody and Placement in Shelter Care was entered by the Court on April 6, 2010.

On April 7, 2010, a second shelter care hearing was held which Reed also attended. Arrangements had been made to transfer C.G. from Mary Bridge Children's Hospital in Tacoma to Seattle Children's hospital for a second opinion that afternoon. The Court determined that because C.G. was in the hospital and would be until he was medically stable, the dependency proceedings would continue and a trial date of May 17, 2010 was set. The Court also determined that C.G. was in need of out-of-home placement and authorized the release of medical information to DSHS in order to determine appropriate services for C.G.

During the entirety of DSHS involvement, C.G. remained in shelter care status. No further shelter care hearings were held as C.G. remained at Seattle Children's Hospital and it was not necessary to determine if C.G. required out-of-home placement. During the time C.G. was hospitalized at Seattle Children's, C.G.'s parents were actively working with hospital staff. Children's Hospital had control over C.G. and would not release him home until they felt the parents were ready for him to come home. The parents were engaged with the staff at Children's Hospital and Reed and others at DSHS did not feel that any further oversight was needed from DSHS. At a hearing on May 19, 2010, the Department recommended the dependency proceeding be dismissed.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

## DISCUSSION

Plaintiffs sued Nicole Reed and John Doe Reed in her individual capacity for violation of civil rights pursuant to 42 U.S.C. § 1983. Plaintiffs also sued the Department of Social and Health Services (DSHS), the agency that employs Ms. Reed who signed the Dependency Petition involving C.G.

**A. Plaintiffs' Claims are Barred by Absolute Immunity.**

Defendant Reed seeks to invoke prosecutorial immunity for signing the dependency petition under penalty of perjury. Parties to section 1983 suits are generally entitled only to immunities that existed at common law. *Imbler v. Pachtman*, 424 U.S. 409, 417-18, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). We have therefore "granted state actors absolute immunity only for

those functions that were critical to the judicial process itself," such as "'initiating a prosecution.'" *Miller v. Gammie*, 335 F.3d 889, 896 (9th Cir. 2003) (en banc) (quoting *Imbler*, 424 U.S. at 431, 96 S.Ct. 984). It follows that social workers have absolute immunity when they make "discretionary, quasi-prosecutorial decisions to institute court dependency proceedings to take custody away from parents." *Id.* at 898. But they are not entitled to absolute immunity from claims that they fabricated evidence during an investigation or made false statements in a dependency petition affidavit that they signed under penalty of perjury, because such actions aren't similar to discretionary decisions about whether to prosecute. A prosecutor doesn't have absolute immunity if he fabricates evidence during a preliminary investigation, before he could properly claim to be acting as an advocate, *see Buckley v. Fitzsimmons*, 509 U.S. 259, 275, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993), or makes false statements in a sworn affidavit in support of an application for an arrest warrant, *see Kalina v. Fletcher*, 522 U.S. 118, 129-30, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997).

Both parties concede that the dependency petition does not mention the parents seeking a second medical opinion from Children's Hospital. The characterization of that omission is outcome determinative in the context of these motions. The plaintiffs argue that the omission is a fabrication that strips her of her immunity. The defendant responds that it is a minor omission that was not material to any subsequent decision by the juvenile court. This Court agrees with Ms. Reed.

The petition was received by the Juvenile Court on April 6, 2010 at 9:58 a.m. The shelter care hearing was conducted at 1:30 p.m. The petition truthfully chronicled the substance of the complaint by the Mary Bridge physicians. At the hearing, the desire for a second opinion was openly discussed with the judge. Between the time of the filing of the petition and the time of

1  the hearing, C.G. was under the care of the Mary Bridge medical staff.  At that very time, the

2  parents, Mary Bridge Hospital and Children's Hospital were arranging for the transfer of C.G. to

3  Children's.  The omission was of a procedural detail that did not alter the nature and grounds of

4  the complaint.  Unless and until a contrary opinion was announced by Children's Hospital, these

5  operative facts before the Court are true.  A promise of a second opinion is not a fact material to

6  the case at the moment.  Ms. Reed did not fabricate evidence.  The Court, armed with the

7  information about the potential second opinion, nevertheless ordered the Shelter Care.  Ms. Reed

8  is entitled to absolute immunity from liability for her quasi prosecutorial decisions.

**B. DSHS Did Not Negligently Investigate an Allegation Which Resulted in a Harmful Placement Decision.**

Plaintiffs sue DSHS under Washington State law for conducting a negligent investigation by pursuing the dependency petition and failing to provide the Court with the requested second opinion in the dependency petition.

"In general, a claim for negligent investigation does not exist under the common law of Washington.  That rule recognizes the chilling effect such claims would have on investigations." *Pettis v. State*, 98 Wn. App. 553, 558, 990 P.2d 453 (1999); *see also, Blackwell v. Department of Social and Health Services*, 131 Wn. App. at 375.  The sole exception to the bar on claims for negligent investigation involves cases in which DSHS social workers or law enforcement officers investigate allegations of abuse and neglect pursuant to RCW 26.44.050.  *Pettis v. State*, 98 Wn. App. 553, 559, 990 P.2d 453 (1999).

The claim of negligent investigation originates from RCW 26.44.050, which requires DSHS to investigate allegations of abuse, and RCW 26.44.010, which provides the purpose of the statutes imposing the obligation to investigate.  The statement of purpose contained in RCW

26.44.010 encompasses two concerns: the integrity of the family and safety of children within the family. *M.W. v. DSHS*, Wn.2d at 589, 599 *citing Tyner*, 141 Wn.2d 68, 80.

Because the cause of action of negligent investigation originates from the statute, it is necessarily limited to remedying the injuries the statute was meant to address." *M.W.*, 149 Wn.2d at 598. In *M.W.*, the Court rejected a negligent investigation claim brought by a minor child based on injuries alleged to have flowed from a visual examination of her vaginal area when she was 18 months old because the statute was not enacted to remedy all harm resulting from alleged negligence flowing from the investigation itself, but rather was enacted to address the two specific harms mentioned above.

> Therefore, a claim for negligent investigation against DSHS is available only to children, parents, and guardians of children who are harmed because DSHS had gathered incomplete or biased information that results in a harmful placement decision, such as removing a child from a nonabusive home, placing a child in an abusive home, or letting a child remain in an abusive home. We decline to expand this cause of action beyond these bounds because the statute from which the tort of negligent investigation is implied does not contemplate other types of harm.

*M.W.*, 149 Wn.2d at 602; *see also Roberson v. Perez*, 156 Wn.2d 33, 44-45 (2005) (claims for negligent investigation are "cognizable only when DSHS conducts a biased or faulty investigation that leads to a harmful placement decision . . . .").

A claim for negligent investigation exists on behalf of parents, even if they were alleged to have abused their child, and on behalf of the child. However, negligent investigation is not available where a claim is based on general negligence occurring during the investigation. *M.W.*, 149 Wn.2d 589; *Pettis*, 98 Wn. App. 553, 560 (negligent investigation not available for an owner of a day care because extending the claim into the non-parental context would be contrary to Legislative intent).

<br>

<br>

<br>

<br>

<br>

ORDER - 8

1    Efforts to expand this narrow cause of action beyond its statutory confines have been
2 repeatedly rejected by Washington courts. *E.g., M.W.*, 149 Wn.2d at 600, 602 (rejecting
3 argument that "DSHS has a general duty of care to act reasonably when investigating child
4 abuse, which includes following correct procedures"); *Roberson v. Perez*, 159 Wn.2d 33, 46-48,
5 123 P.3d 844 (2005) (rejecting request to enlarge the negligent investigation cause of action to
6 include harms caused by "constructive placement decisions"); *Blackwell v. DSHS*, 131 Wn. App.
7 372, 378-79, 127 P.3d 752 (2006) (rejecting expansion of the class who can sue for negligent
8 RCW 26.44.050 investigations to include foster parents). Outside of RCW 26.44.050,
9 Washington courts have consistently refused to imply tort duties from other child welfare
10 statutes. *E.G., Braam*, 150 Wn.2d at 711-12 (no private cause of action can be implied from
11 RCW 74.13.250, RCW 74.13.280, or RCW 17.14A.050); *Aba Sheikh*, 165 Wn.2d at 457-58 (no
12 private cause of action can be implied from three WAC regulations pertaining to dependent
13 children).

14    Furthermore, a court order governing placement severs liability. Allegations that an
15 investigation was negligent are not enough to state a cause of action without evidence that the
16 negligence impacted the outcome of the dependency process by depriving the court of a material
17 fact. *Tyner*, 141 Wn.2d at 88. As stated by the court:

18 > We hold that a judge's no-contact order will act as superseding intervening cause, precluding liability of the State for negligent investigation, only if all material
19 > information has been presented to the court and reasonable minds could not differ as to the question.

20
*Id*.
21
    In this case, the Court had the information about the request for second opinion and
22
nevertheless granted the Shelter Care order. His decision severs liability for DSHS.
23

24

1  Defendants' Motion for Summary Judgment (Dkt. 31) is **GRANTED.** Plaintiffs' Motion
2  for Partial Summary Judgment (Dkt. 27) is **DENIED.** This matter is **DISMISSED** with
3  prejudice.

4  Dated this 15th day of May, 2015.

/s/ Ronald B. Leighton

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE